**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF LOUISIANA, *et al.*<br><br>Defendants. | Case No. 26-2612 |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 2

I. The CEA provides a comprehensive regulatory framework for commodity derivatives markets in the United States, including event-contract markets ..... 2

II. Event contracts have long traded subject to Commission oversight ..... 4

III. Louisiana attempts to usurp regulatory authority over event contracts ..... 8

LEGAL STANDARD ..... 8

ARGUMENT ..... 9

I. Federal law preempts state law as to commodity derivatives transaction on CFTC-regulated DCMs ..... 9

A. Louisiana state law is preempted as applied to swap transactions on DCMs ..... 10

i. Express preemption ..... 11

ii. Conflict preemption ..... 13

iii. Field preemption ..... 15

B. Event contracts are "swaps" under the CEA ..... 17

II. The remaining factors favor granting preliminary relief ..... 23

CONCLUSION ..... 24

## TABLE OF AUTHORITIES

Cases

*American Agric. Movement v. Board of Trade of Chi.*,
977 F.2d 1147 (7th Cir. 1992) ....................10, 14, 15

*Arizona v. United States*,
567 U.S. 387 (2012) ....................10, 13

*Atlantic Richfield Co. v. Christian*,
590 U.S. 1 (2020) ....................13

*Bibbo v. Dean Witter Reynolds, Inc.*,
151 F.3d 559 (6th Cir. 1998) ....................15

*CFTC v. Spagnuolo,*
No. 1:26-cv-4419 (S.D.N.Y.) ....................5, 22

*CFTC v. Van Dyke,*
No. 1:26-cv-3369 (S.D.N.Y.) ....................5, 22

*Clark v. Prichard*,
812 F.2d 991 (5th Cir. 1987) ....................9

*Coinbase Fin. Mkts. v. Raoul*,
2026 WL 2969682 (N.D. Ill. Oct. 2, 2026) ....................2, 18, 19

*Effex Cap., LLC v. National Futures Ass'n*,
933 F.3d 882 (7th Cir. 2019) ....................10, 16

*Evans v. Garza*,
161 F.4th 315 (5th Cir. 2025) ....................9

*Geo Grp., Inc. v. Newsom*,
50 F.4th 745 (9th Cir. 2022) ....................14

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007) ....................23

*Hughes v. Talen Energy Mktg., LLC*,
578 U.S. 150 (2016) ....................10

*In re: Blockratize, Inc. d/b/a Polymarket.com*,
CFTC Docket No. 22-09 (Jan. 3, 2022) ....................21, 22

*In re: Gabriel Perez*,
CFTC Docket No. 26-06 (Aug. 28, 2026) ....................5

*In re: George Anthony Devolder Santos*,
CFTC Docket No. 26-05 (July 31, 2026) ....................5

*KalshiEX LLC v. Assad*,
190 F.4th 1098 (9th Cir. 2026) ....................10, 11, 19

*KalshiEX, LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026) ....................2, 10, 17, 18, 24

*KalshiEX LLC v. Schuler*,
192 F.4th 664 (6th Cir. 2026) ....................10, 12, 18

*Kansas v. Garcia*,
589 U.S. 191 (2020) ....................15

*Leist v. Simplot*,
638 F.2d 283 (2d Cir. 1980) ....................10

*Merrill Lynch Int'l v. XL Cap. Assur. Inc.*,
564 F. Supp. 2d 298 (S.D.N.Y. 2008) ....................13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) .................... 1-2, 16

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ....................23

*Murphy v. National Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) ....................15

*Nken v. Holder*,
556 U.S. 418 (2009) ....................9

*Puerto Rico v. Franklin California Tax-free Tr.*,
579 U.S. 115 (2016) ....................13

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie*,
608 F.3d 200 (5th Cir. 2010) ....................23

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) ....................23, 24

*United States v. Minnesota*,
__ F. Supp. 3d ___, 2026 WL 2150211 (D. Minn. July 27, 2026) .......... 2, 11, 13, 18, 19

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .......... 17

*United States v. Spagnuolo*,
No. 1:26-mj-02020 (S.D.N.Y.) .......... 6

*United States v. Van Dyke*,
No. 1:26-cr-156 (S.D.N.Y.) .......... 6

Statutes

7 U.S.C. § 1a .......... 3, 17–18, 20

7 U.S.C. § 2 .......... 1, 11, 12, 13, 16, 20

7 U.S.C. § 7 .......... 3, 5, 15–16, 22

7 U.S.C. § 7a-2 .......... 3, 14–15, 16, 19, 22

7 U.S.C. § 8 .......... 5

7 U.S.C. § 13a-2 .......... 11

7 U.S.C. § 16 .......... 11, 12–13

15 U.S.C. § 8302 .......... 6

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010) .......... 3

Regulations

17 C.F.R. § 38.150 .......... 3

17 C.F.R. § 38.151 .......... 14

17 C.F.R. § 38.200 .......... 3

17 C.F.R. § 38.250 .......... 3

17 C.F.R. § 38.5 .......... 5

17 C.F.R. § 40.2 .......... 5, 14

17 C.F.R. § 40.3 .......... 14–15

Legislative Materials

120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974)....16

H.R. Rep. No. 93-1383 (1974)....16

S. Rep. No. 95-850, *reprinted in* 1978 U.S.C.C.A.N. 2087 ....16

Hearings Before the Comm. on Agric. & Forestry, 119th Cong. 59 (Dec. 11, 2025), (statement of Robert A. Schwartz)....21

Hearings Before the Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974)....14

Other Authorities

Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. Bus. Rev. 1 (2019)....12

Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225 (2000)....15

CFTC, Contracts & Products, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm....4

CFTC, Designated Contract Market Products, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizationProducts. ....21

CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm....2

CFTC, *Order Directing Kalshi to Continue Exercising DCM Functions* (Aug. 11, 2026) ....5

CFTC, *Order Instituting Proceedings and Staying the Listing of the Contract Under Commission Regulation 40.2(c)* (Oct. 21, 2026) ....7

CFTC, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents* (July 14, 2026) ....5

CFTC, *Order to Withdraw Certification Under Commission Regulation 40.2(d) and Instituting Proceedings and Staying the Listing of Contracts Under Commission Regulation 40.2(c)* (Oct. 22, 2026) ....7

CFTC, Release No. 9278-26, *CFTC Reminds Markets to Display Clear Pricing Information* (Aug. 7, 2026), https://www.cftc.gov/PressRoom/PressReleases/9278-26 ....7

CFTC, Release No. 9302-26, *CFTC Releases Staff Advisory on Mention Markets* (Sept. 22, 2026), https://www.cftc.gov/PressRoom/PressReleases/9302-26 .............................................7

CFTC, Release No. 9724, *CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Affiliations Among Certain CFTC-Regulated Entities* (July 30,2026), https://www.cftc.gov/PressRoom/PressReleases/9724-26 .........................................................7

CFTC Staff Letter No. 93-66 (June 18, 1993) ....................................................................4

Concept Release on the Appropriate Regulatory Treatment of Event Contracts, 73 Fed. Reg. 25,669 (May 7, 2008)..............................................................................4

Data Reporting Requirements for Certain Event Contracts, 91 Fed. Reg. 40,102 (July 1, 2026) .............................................................................6

DCM Impartial Access Requirements, 91 Fed. Reg. 72,407 (Nov. 10, 2026) ..........................................................................14

Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969 (Oct. 19, 2026) ............................................................................6

Further Definition of "Swap" to Include Event Contracts, 91 Fed. Reg. 66,022 (Oct. 19, 2026) ..................................................................6, 20, 21

Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance, 91 Fed. Reg. 37,873 (June 24, 2026)...........................................................................6

Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) ....................................................................6, 22

Julia Ingram and Madeleine May, *How well did Kalshi predict the midterms? We crunched the numbers.*, CBS NEWS, Nov. 10, 2026, https://www.cbsnews.com/projects/2026/ kalshi-midterms26/ ..........................................................................................................4

R. Chandarana, et al., The next forecasting edge may come from prediction market signals, EY (Oct. 21, 2026)................................................................................................................4

Reuters, *Prediction Markets Take a Swing at Hedging for US Small Business* (Aug. 28, 2026), https://www.reuters.com/business/prediction-markets-take-swing-hedging-us-small-businesses-2026-08-28/ .................................................................................................21

Steven D. Levitt, *Why Are Gambling Markets Organised So Differently from Financial Markets?*, 114 Econ. J. 223, 223 (2004)......................................................................20

## PRELIMINARY STATEMENT

Throughout the country, federal courts are grappling with the question of whether event contracts offered by CFTC-registered derivatives exchanges are subject to federal or state law. The Western and Eastern Districts of Louisiana were set to weigh in soon. *See QCX LLC v. Murrill*, No. 2:26-cv-02482 (E.D. La.); *KalshiEX, LLC v. Murrill*, No. 1:26-cv-4476 (W.D. La.). But rather than litigate those existing actions, Louisiana, through its Attorney General, filed a civil enforcement action in state court against over 30 entities—including multiple CFTC registrants—seeking to bar those entities from "[o]perating" in the State or "offering products and/or services" in the State. Petition, *Louisiana v. Kalshi, Inc., et al.*, No. 20260004268, ⁋ 249 (21st Judicial District Court, Tangipahoa Parish, Nov. 12, 2026), attached as **Exhibit A**. The State immediately filed, and the state court instantly granted, an *ex parte* temporary restraining order that broadly prohibits these registered exchanges from operating in Louisiana, with only passing mention of the Commodity Exchange Act ("CEA")—the federal statute that governs these exchanges and the transactions they facilitate. *See id.* at n.59. That end-run around the federal government's "exclusive jurisdiction" should be immediately enjoined. *See* 7 U.S.C. § 2(a)(1)(A).

State law cannot be used to ban derivatives traded on federally regulated exchanges, let alone on an *ex parte*, emergency basis after those exchanges have been operating in the State for years. Under the CEA, the event contracts that Louisiana seeks to prohibit are "swaps," and the exchanges on which these event contracts trade are designated contract markets ("DCMs"). The CEA expressly confers "exclusive jurisdiction" upon the Commission to regulate "transactions involving swaps" that are traded on DCMs, 7 U.S.C. § 2(a)(1)(A), and more broadly, the Act provides a "comprehensive regulatory structure [for] oversee[ing] the volatile and esoteric futures trading complex" that is administered only by the Commission. *Merrill Lynch, Pierce, Fenner &*

*Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). Accordingly, courts across the country have held that state law is preempted to the extent it purports to regulate or prohibit transactions involving swaps is therefore preempted. *See, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026); *Coinbase Fin. Mkts., Inc. v. Raoul*, 2026 WL 2969682, at *18 (N.D. Ill. Oct. 2, 2026); *United States v. Minnesota*, 2026 WL 2150211, at *18 (D. Minn. July 27, 2026).

The federal courts in this State might well have joined them. But the State has managed to end-run those cases by getting a lone state-court judge to shut down *the entire event-contract industry* in Louisiana on an *ex parte* basis. That unprecedented move not only circumvents the federal-court litigation process; it completely strips the CFTC of *any* jurisdiction—let alone "exclusive" jurisdiction—over event contracts in the State. Because the CEA preempts Louisiana's attempt to brandish its state law as a cudgel to ban and punish CFTC-regulated markets, this Court should halt the State's enforcement of its preempted laws against DCMs by entering a temporary restraining order and preliminary injunction.

## BACKGROUND

### I. The CEA provides a comprehensive regulatory framework for commodity derivatives markets in the United States, including event-contract markets

The CFTC is the federal executive agency that administers the CEA, enforces it in federal courts, and regulates commodity derivatives markets. A "derivative" is a financial instrument such as a future, option, or swap for which the price is directly dependent upon—that is, "derived from"—the value of something else, such as an agricultural or financial commodity.[1] In general, market participants use derivatives to hedge risks or speculate on commodity price movements.

---

[1] CFTC, Futures Glossary: A Guide to the Language of the Futures Industry, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

Many derivatives must be traded on a DCM, which is a national exchange that operates under the Commission's regulatory oversight. *See* 7 U.S.C. § 7. The Commission designates an exchange as a DCM through a formal application process in which an applicant must demonstrate its ability to comply with detailed statutory and regulatory requirements called "core principles." *Id.* § 7(d). These core principles require DCMs to, among other things, establish and enforce compliance with market rules, 17 C.F.R. § 38.150(a); list only contracts that are not readily susceptible to manipulation, *id.* § 38.200; and have the capacity to prevent manipulation or price distortions, *id.* § 38.250. Today, 33 exchanges in the United States have active designations from the Commission to operate as a DCM.

A "swap" is a type of derivative that encompasses, among other things, "any agreement, contract, or transaction . . . that provides for any . . . payment[] or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Indeed, any "agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap" is a swap. *Id.* § 1a(47)(A)(iv). In the 2010 Dodd-Frank Act, Congress extended the Commission's "exclusive jurisdiction" to encompass "accounts, agreements . . ., and transactions involving swaps." Pub. L. No. 111-203, § 722(a)(1)(D), 124 Stat. 1376, 1672 (2010) (codified at 7 U.S.C. § 2(a)(1)(A)). It also added a "Special Rule" granting the Commission authority to prohibit certain swaps called "event contracts" if those contracts involve certain events and the Commission determines that the contracts are contrary to the public interest. *Id.* § 745(a), 124 Stat. at 1736–37 (codified at 7 U.S.C. § 7a-2(c)(5)(C)).

## II. Event contracts have long traded subject to Commission oversight

An "event contract" is a CFTC-regulated "derivative contract whose payoff is based on a specified event, occurrence, or value."[2] Event contracts have become increasingly popular with retail and institutional traders, and many firms now rely on forecasts derived from prediction markets.[3] And event-contract markets have been praised for their accuracy in predicting local, statewide, and national races.[4] But event contracts are not recent innovations. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on" events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." 73 Fed. Reg. 25,669, 25,671 (request for comments May 7, 2008). In 1993, the Commission issued a no-action letter to Iowa Electronic Markets, allowing the facility to list event contracts tied to U.S. and Canadian elections.[5] And by 2005, event contracts encompassed "the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of legislation," and even "the length of celebrity marriages." 73 Fed. Reg. at 25,670.

Today, event contracts are listed on numerous CFTC-registered DCMs, whether they be relatively new markets like Kalshi, QCX ("Polymarket US"), and Gemini Titan, or longstanding

---

[2] CFTC, *Contracts & Products*, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm.

[3] R. Chandarana, et al., *The next forecasting edge may come from prediction market signals*, EY (Oct. 21, 2026), https://www.ey.com/en_us/insights/banking-capital-markets/using-prediction-market-signals-to-improve-forecasting.

[4] *See, e.g.,* Julia Ingram and Madeleine May, *How well did Kalshi predict the midterms? We crunched the numbers.*, CBS NEWS, Nov. 10, 2026, https://www.cbsnews.com/projects/2026/kalshi-midterms26/ ("Ultimately, the candidates who Kalshi markets favored won 95% of congressional or gubernatorial midterm races. . . . Experts say that the election markets get so many races right because of the large volume of people participating, and the availability of high-quality information to base trades on.").

[5] CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default/files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

ones like North American Derivatives Exchange ("Nadex") and CME Group. The Commission exercises its exclusive jurisdiction over event contracts in myriad ways. For example, it requires DCMs to complete a registration process with the Commission before listing products for trading, and it monitors their activity to ensure that they comply with the CEA's core principles. *See* 7 U.S.C. § 7. DCMs must self-certify event contracts as CEA-compliant to the CFTC before listing them for trading. 17 C.F.R. § 40.2. The Commission reviews rule changes from DCMs that offer event contracts and, when necessary, exercises its emergency power to order them to fulfill trades.[6] The Commission is empowered to require DCMs to demonstrate continued compliance with the CEA. *Id.* § 38.5. And the Commission may suspend or revoke a DCM's designation if the DCM fails to comply with the CEA and CFTC regulations. 7 U.S.C. § 8(b).

The federal government also polices fraudulent trading of event contracts. The Commission has filed civil enforcement actions and obtained settlements for insider trading on prediction markets. *See CFTC v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.) (U.S. servicemember who used sensitive nonpublic information to trade event contracts related to the ouster of Venezuelan President Nicolás Maduro); *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.) (Google employee who used nonpublic information to trade event contracts related to Google's Year in Search list); CFTC, *In re: George Anthony Devolder Santos*, CFTC Docket No. 26-05 (July 31, 2026) (imposing penalties on former Congressman George Santos for manipulative activity around State of the Union event contracts); CFTC, *In re: Gabriel Perez*, CFTC Docket No. 26-06 (Aug. 28, 2026) (imposing penalties on teleprompter operator who used nonpublic

---

[6] CFTC, *Order Directing Kalshi to Continue Exercising DCM Functions* (Aug. 11, 2026), https://www.cftc.gov/media/14471/OGC_MarketEmergencyDeclarationOrder081126/download; CFTC, *Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents* (July 14, 2026), https://www.cftc.gov/filings/documents/2026/orgcftcorderstayingkalem61407.pdf.

information to trade event contracts related to President Trump's speeches). The Justice Department has also brought commodity-fraud prosecutions for insider trading of event contracts, which presupposes CEA coverage. *United States v. Van Dyke*, No. 1:26-cr-156 (S.D.N.Y.); *United States v. Spagnuolo*, No. 1:26-mj-02020 (S.D.N.Y.).

The Commission is engaged in significant rulemaking concerning event contracts and prediction markets. Most notably, the Commission has issued a Notice of Proposed Rulemaking regarding the types of event contracts that may be found contrary to the public interest under the Special Rule, and therefore barred from trading. *See* 91 Fed. Reg. 35,806 (proposed June 12, 2026). Furthermore, last month, the CFTC and the Securities Exchange Commission ("SEC") exercised their statutory authority to "further define the term [] 'swap,'" *see* 15 U.S.C. § 8302(d)(1), by issuing a Notice of Proposed Rulemaking proposing to further define the term "swap" to encompass event contracts based on sports-, political-, weather-, and cultural-related events—a rule that, if finalized, would unequivocally classify as swaps the same contracts that Louisiana has managed to ban on an *ex parte* basis. See 91 Fed. Reg. 66,022 (Oct. 19, 2026). The Commissions also released an Interim Final Rule that excludes from the definition of "swap" gambling wagers offered by casinos or sportsbooks licensed under state or tribal law. *See* 91 Fed. Reg. 65,969 (Oct. 19, 2026). And much more:

- The CFTC and SEC issued a joint request for comment on definitional and regulatory clarity with respect to swaps. 91 Fed. Reg. 37,873 (June 24, 2026).
- The CFTC issued a Notice of Proposed Rulemaking concerning data-reporting requirements for certain event contracts. *See* 91 Fed. Reg. 40,102 (proposed July 1, 2026).
- The Commission also announced proposed rulemaking concerning affiliations between CFTC-regulated entities that would address issues concerning perceived and potential

conflicts of interest. CFTC, Release No. 9274-26, *CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Affiliations Among Certain CFTC-Regulated Entities* (July 30, 2026), https://www.cftc.gov/PressRoom/PressReleases/9274-26.

- The Commission issued a letter "remind[ing] Commission-regulated entities involved in the listing, soliciting, or acceptance of event contracts of their responsibility not to mislead consumers, including the obligation to display clear and accurate pricing information for derivatives products." CFTC, Release No. 9278-26, *CFTC Reminds Markets to Display Clear Pricing Information* (Aug. 7, 2026), https://www.cftc.gov/PressRoom/PressReleases/9278-26.
- The Commission issued an advisory cautioning that "mention market" contracts—*i.e.*, event contracts based on whether an individual will say or mention certain words—present a heightened risk of manipulation and therefore may violate the CEA. CFTC, Release No. 9302-26, *CFTC Releases Staff Advisory on Mention Markets* (Sept. 22, 2026), https://www.cftc.gov/PressRoom/PressReleases/9302-26.
- The Commission has ordered exchanges to take down event contracts that appear not to meet the definition of "swap" or otherwise violate the CEA. CFTC, *Order Instituting Proceedings and Staying the Listing of the Contract Under Commission Regulation 40.2(c)* (Oct. 21, 2026), https://www.cftc.gov/filings/documents/2026/orgdcmprophxorderins261022.pdf; CFTC, *Order to Withdraw Certification Under Commission Regulation 40.2(d) and Instituting Proceedings and Staying the Listing of Contracts Under Commission Regulation 40.2(c)* (Oct. 22, 2026), https://www.cftc.gov/filings/documents/2026/orgdcmludloworder261023.pdf.

### III. Louisiana attempts to usurp regulatory authority over event contracts

Notwithstanding the CFTC's "exclusive jurisdiction" to regulate swaps, including event contracts, Louisiana appears intent on driving these markets out of the State altogether by incorrectly treating derivatives traded on a DCM as "gambling by computer" and penalizing DCMs for claiming their CFTC-regulated products were, in fact, lawful. Facing threatened state enforcement, two DCMs filed in federal courts to enjoin the State from taking preempted enforcement action, and those actions remain pending. *See QCX LLC,* No. 2:26-cv-02482 (E.D. La.); *KalshiEX LLC*, No. 1:26-cv-4476 (W.D. La.).

Ignoring both the federal regulator and the ongoing lawsuits, yesterday the State filed an enforcement action in the 21st Judicial District Court in the Parish of Tangipahoa against over 30 entities, including CFTC-registered entities, seeking an order preventing them from offering event contracts in Louisiana. *See* Ex. A. Notwithstanding that these markets have operated in the State for years, Louisiana then immediately moved for an *ex parte* temporary restraining order barring any of these registered entities from operating within Louisiana—full stop. *See* Ex. A at ⁋ 249 (seeking to bar the defendants from "[o]perating in and/or offering products and/or services to persons located in Louisiana"). The state court—in a two-and-a-half page order—instantly granted the motion and issued a temporary restraining order ("TRO"). *See* TRO, attached as **Exhibit B**. The TRO immediately bars the named registered entities from operating in Louisiana and advertising that their products are legal in Louisiana. The TRO also requires the registered entities to "geofence the State of Louisiana so that [their] illegal offerings . . . are not accessible to persons located within the State." *Id.*

## LEGAL STANDARD

"The factors governing a preliminary injunction are . . . (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued;

(3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Evans v. Garza*, 161 F.4th 315, 320 (5th Cir. 2025) (internal citations omitted); *see also Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (same factors apply to issuance of a TRO). When the federal government is involved, the third and fourth factors—balance of equities and public interest—merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

This Court should enter a TRO and preliminary injunction because Louisiana's state laws are preempted as applied to federally regulated DCMs listing swaps, and the State's enforcement of its preempted state laws causes irreparable harm to the plaintiffs.

### I. Federal law preempts state law as to commodity derivatives transactions on CFTC-regulated DCMs

Louisiana's attempt to prohibit sports-related event contracts is preempted by federal law. This is so for two reasons. First, Congress gave the Commission "exclusive jurisdiction" to regulate transactions involving swaps, thereby preempting state regulation. Indeed, Congress's creation of the CEA—and conferral of "exclusive jurisdiction" on the Commission—was prompted in large part by repeated conflicts with a patchwork of state laws. *See* Dkt. No. 1 ¶¶ 62–63. And second, the event contracts targeted by Louisiana qualify as "swaps" under the CEA.

The merits in this case should be easy. Louisiana seeks a blanket ban that prohibits CFTC-registered exchanges, clearinghouses, and other intermediaries from "operating in and/or offering products and/or services to persons located in Louisiana." Ex. A ¶ 249. That relief would prohibit these entities from offering *any* swaps (or any other kind of derivative, for that matter) in Louisiana. So as long as the Court concludes that at least *some* event contracts offered by the

targeted DCMs are "swaps" subject to the Commission's "exclusive jurisdiction," Louisiana's blanket ban must be enjoined.

### A. Louisiana state law is preempted as applied to swap transactions on DCMs

Under the Supremacy Clause, "federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 162 (2016). Most directly, Congress can "express[ly]" withdraw specified powers from the States. *Arizona v. United States*, 567 U.S. 387, 399 (2012). And "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by . . . exclusive [federal] governance." *Id.* "[S]tate laws are [also] preempted when they conflict with federal law." *Id.*

All five courts of appeals to consider the issue have held that the CEA preempts at least some state law as applied to derivatives traded on DCMs. *See KalshiEX LLC v. Schuler*, 192 F.4th 664, 698 (6th Cir. 2026) ("[T]he exclusive jurisdiction provision displaces direct enforcement and regulatory authority pertaining to the licensing and operation of DCMs"); *KalshiEX, LLC v. Assad*, 190 F.4th 1098, 1110 (9th Cir. 2026) (exclusive-jurisdiction provision "preempts state regulation of swaps that are 'traded or executed' on a DCM"); *Flaherty*, 172 F.4th at 228–29 (exclusive-jurisdiction provision is field preemptive); *Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (state law preempted where it "directly affect[s] trading on or the operation of a futures market" (quoting *American Agric. Movement v. Board of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992))); *Leist v. Simplot*, 638 F.2d 283, 322 (2d. Cir. 1980) ("[T]he CEA preempts the application of state law.").

Whether on express, field, or conflict preemption grounds, federal law preempts Louisiana law wielded to ban event contracts and impose crushing civil penalties on DCMs.

**i. Express preemption**

**1.** Congress gave the Commission "exclusive jurisdiction . . . with respect to transactions involving swaps" traded on a DCM. 7 U.S.C. § 2(a)(1)(A). That necessarily means other governmental authorities—including the States—lack "jurisdiction" over "transactions involving swaps" traded on a DCM. *See Minnesota*, 2026 WL 2150211, at *10 (explaining the terms "exclusive" and "jurisdiction" "reflect congressional intent to give the CFTC the power over transactions in swaps that is independent from or not shared by other authorities").

The savings clause that follows only reinforces the exclusive-jurisdiction provision's preemptive force. *See Assad*, 190 F.4th at 1110 ("Likewise, § 2(a)(1)(A)'s saving[s] clause shows that Congress meant it to be a preemptive provision."). It states that "[*e*]*xcept as hereinabove provided*," the CEA does not "supersede or limit the jurisdiction at any time conferred on . . . regulatory authorities under the laws of . . . any State" or "restrict" state authorities "from carrying out their duties and responsibilities." 7 U.S.C. § 2(a)(1)(A) (emphasis added). That carveout only makes sense if state law is otherwise preempted by the "exclusive jurisdiction" clause. *See Effex*, 933 F.3d at 894 (preemption follows from "both the savings clause and the jurisdictional clause"). Indeed, if state law is not otherwise preempted by the "exclusive jurisdiction" clause, the savings clause would be "superfluous." *Assad*, 190 F.4th at 1110.

**2.** Other CEA carveouts for state authority further underscore Congress's preemptive intent. Section 13a-2, entitled "Jurisdiction of States," allows States to enforce the CEA and CFTC regulations against various persons, but not "a contract market," "clearinghouse," or other CFTC-registered intermediaries. 7 U.S.C. § 13a-2(1). And apart from "general civil or criminal antifraud statute[s]," *id.* § 13a-2(7), nothing in that provision allows States to enforce their own laws. Furthermore, Section 16(e) provides for concurrent federal and state jurisdiction over certain *off-DCM* transactions, *id.* § 16(e)(1)(B)–(C). Yet Congress did not provide for state law to apply to

*on-DCM* transactions, further reinforcing that state law has no application to swap transactions executed on a DCM.

**3.** The more limited express-preemption provisions in the CEA confirm § 2(a)(1)(A)'s scope. Most notably, § 16(e)(2) provides that the CEA "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" as applied to "an agreement, contract, or transaction that is *excluded* from this chapter under section 2(c) or 2(f) of this title or sections 27 to 27f of this title, or *exempted* under section 6(c) of this title." 7 U.S.C. § 16(e)(2) (emphasis added). Some courts have suggested that these express preemption provisions mean that state law is not preempted in other circumstances. *E.g., Schuler*, 192 F.4th at 698. But if § 16(e)(2) were the only CEA provision that could preempt state law, the statute would be incoherent. On that theory, the CEA would *only* preempt state law as applied to transactions over which the Commission exercises minimal regulatory oversight—"excluded" or "exempted" transactions—but would not as to transactions subject to the Commission's full regulatory oversight. That makes no sense. The far more natural way to read the CEA's structure is that § 2(a)(1)'s "exclusive jurisdiction" provision preempts state law as to swaps, and § 16(e)(2) functions as a backstop preempting state gambling law *even as to* transactions where the CEA gives the CFTC less oversight authority. *See* Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. Bus. Rev. 1, 6 (2019) ("Exclusive jurisdiction under section 2(a)(1)(A) is also preemptive jurisdiction; it has a much broader preemptive reach than gaming and bucket shop law-style preemption under section [16](e)(2)(B), which covers only excluded or exempt contracts over which the CFTC would [generally] have no jurisdiction.").

Similarly, § 16(h) provides that a swap "shall not be considered to be insurance" and accordingly "may not be regulated as an insurance contract under the law of any State." 7 U.S.C.

§ 16(h). The preemption of state insurance law in no way implies the non-preemption of other state laws. Section 16(h) was enacted in the aftermath of the 2008 financial crisis, which many in Congress attributed to credit default swaps—"an arrangement similar to an insurance contract." *Merrill Lynch Int'l v. XL Cap. Assur. Inc.*, 564 F. Supp. 2d 298, 300 (S.D.N.Y. 2008). Under the circumstances, it is a perfectly "likely" inference that Congress used a "belt and suspenders approach to make sure that *all*" swaps were exempt from state regulation as insurance, *see Atlantic Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020), far more likely than the notion that Congress preempted state insurance law yet implicitly allowed for all other state law to apply to swaps.

**4.** Finally, no presumption against preemption applies in this case. When a "statute contains an express pre-emption clause, [the court] do[es] not invoke any presumption against pre-emption but instead focus[es] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016); *see also Minnesota*, 2026 WL 2150211, at *10 ("When Congress has expressly preempted state legislation, courts do not apply any 'presumption against preemption.'"). The CEA's vesting of "exclusive jurisdiction" in a federal regulator precludes any presumption against preemption. 7 U.S.C. § 2(a)(1)(A).

**ii. Conflict preemption**

In addition, "state laws are preempted when they conflict with federal law." *Arizona*, 567 U.S. at 399. Conflict preemption occurs where "compliance with both federal and state regulations is a physical impossibility" and where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (citations omitted).

It is hard to imagine a more direct conflict than this case presents. Louisiana seeks to ban major, federally regulated markets from its borders for offering contracts in compliance with the

federal-law framework. Indeed, it is impossible for DCMs to heed Louisiana's directives and comply with federal law. Federal law requires a DCM to provide "impartial access to its markets and services" to all its "members," and to provide "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). As the Commission recently explained, "The CEA and Commission Regulations generally do not permit a DCM to limit access based on the location of an otherwise eligible market participant within the United States." 91 Fed. Reg. 72,407, 72,409 (Nov. 10, 2026). Louisiana 's attempts to prevent DCMs from so much as *operating* in the State thus requires what federal law forbids.

If nothing else, subjecting CFTC-regulated markets to state-by-state requirements would stand as an impermissible obstacle to federal regulation. "As Congress recognized in enacting the [CFTC] Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *American Agric.*, 977 F.2d at 1156. Thus, allowing States to regulate event contracts could reintroduce the "total chaos" Congress sought to prevent by providing the Commission exclusive jurisdiction over futures trading in 1974.[7] And it would encourage the kind of "interference with the discretion that federal law delegates to federal officials [that] goes to the heart of obstacle preemption." *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 762 (9th Cir. 2022) (en banc).

Louisiana's application of state law would also stand as an obstacle to the CEA's self-certification framework. The Act expressly allows DCMs to self-certify contracts as "swaps" for trading, subject to Commission review. 7 U.S.C. § 7a-2(c)(1), (5)(B); 17 C.F.R. § 40.2. The Commission can also expressly approve contracts for trading. 7 U.S.C. § 7a-2(c)(4)(A), (5)(B); 17

[7] *See* Hearings Before the Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

C.F.R. § 40.3. Allowing state law to undermine these determinations would directly disrupt "the operation of a contract market." *American Agric.*, 977 F.2d at 1157; *see also Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 564 (6th Cir. 1998) (CFTC regulations obstacle-preempt state law that "deprives [CFTC registrants] of a valuable benefit granted them in Regulation 1.29").

Louisiana, of course, will fight the premise that event contracts are derivatives at all. The State is wrong about that. *See infra* § I.B. But even if there were some debate, the Court should grant an injunction. The State is not seeking to bar certain contracts that it sees as beyond the reach of the CEA; rather, it has sought, and obtained, a TRO to ban those markets from the State indiscriminately. So long as these markets are offering a *single contract* that is a derivative subject to the CFTC's "exclusive jurisdiction," Louisiana has no grounds for excluding those markets from its borders wholesale.

**iii. Field preemption**

"Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation,'" *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453, 479 (2018), or when "a federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," *Arizona*, 567 U.S. at 399. "[L]ike all [forms of] preemption," field preemption "must be grounded 'in the text and structure of the statute.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020).

Congress gave the Commission "exclusive jurisdiction" over "swaps . . . traded or executed on a [DCM]," and it allowed state "regulatory authorities" to retain jurisdiction only "[e]xcept as hereinabove provided." 7 U.S.C. § 2(a)(1)(A). A "'jurisdictional' rule of federal law" of this variety is "typically associated with 'field' preemption, whether express or implied." Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 261 (2000). DCMs, moreover, are subject to extensive regulation by the Commission. They must, among other things, apply for registration with the

Commission, 7 U.S.C. § 7(a); comply with "core principle[s]" governing trading, *id.* § 7(d); and self-certify compliance with the CEA and the Commission's regulations, *id.* § 7a-2(c)(1).

The CEA's occupation of the field of on-exchange derivatives trading has a long history. Through the CEA, Congress created "a comprehensive regulatory structure" over "futures trading," *Curran*, 456 U.S. at 356, and it vested jurisdiction over swaps—including event contracts—exclusively with the CFTC. When Congress created the CFTC in 1974, it gave the Commission "exclusive jurisdiction" to administer the CEA, 7 U.S.C. § 2(a)(1)(A). As the Conference Report details, this "exclusive grant of jurisdiction" to the Commission was designed to "preempt the field insofar as futures regulation is concerned," such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383, at 35–36 (1974); *see Effex*, 933 F.3d at 894 ("[A] catalyst for the significant [1974] amendments to the Commodity Exchange Act was a fear that, without increased federal regulation, the states would regulate the futures markets to a chaotic effect."). Congress also deleted from the CEA language that allowed the States to retain a measure of regulatory authority, which "assure[d] that Federal preemption is complete." 120 Cong. Rec. S 30458, 30464 (Sept. 9, 1974).

The 1974 amendments were so understood to be broadly preemptive that four years later Congress created a statutory cause of action for States to enforce the CEA in federal court. Pub. L. 95-405, § 15, 92 Stat. 865 (1978). The Committee Report cited "the reluctance of the states, *whose regulatory authority had been preempted by the 1974 amendments*, to bring *parens patriae* actions under the [CEA] or actions under their general antifraud statutes." S. Rep. No. 95-850, at 14, *reprinted in* 1978 U.S.C.C.A.N. 2087, 2102 (first emphasis added). Congress placed jurisdiction over these actions in the federal courts because it was "consistent with the Commission's exclusive

jurisdiction and preemption of state regulatory activity enacted in 1974." S. Rep. No. 95-850, at 25, *reprinted in* 1978 U.S.C.C.A.N. 2087, 2113.

The enactment of the Special Rule in 2010 further consolidated the Commission's control over the field of event contracts. *See* 7 U.S.C. § 7a-2(c)(5)(C). That Rule, again, grants the Commission discretionary authority to bar event contracts that involve certain enumerated categories of activity and that the Commission determines are contrary to the public interest. *Id.* § 7a-2(c)(5)(C)(i)–(ii). By creating a specific public-interest review process, Congress clearly signaled that these contracts are within the Commission's regulatory purview, not the States'.

* * *

The CEA preempts Louisiana's efforts to indiscriminately ban—on an *ex parte* basis, no less—derivatives exchanges, clearinghouses, and other intermediaries from the State.

**B. Event contracts are "swaps" under the CEA**

Louisiana has sought to enjoin more than 30 defendants from "[o]perating in and/or offering products and/or services to persons located in Louisiana"—that relief apparently includes *all* CFTC-regulated event contracts. Ex. A at ¶ 249. Even if Louisiana could use state law to dictate what may or may not be listed on a DCM—which it can't, see *supra* Part II.A—there can be no doubt that at least *some* of the contracts the State seeks to ban are swaps. Accordingly, Louisiana has no basis to indiscriminately ban derivatives markets from the State.

Congress "defined 'swap' broadly." *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). A "swap" is a contract that makes payment (1) "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" that is (2) "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Event contracts qualify as "swaps" under this definition. *See Flaherty*, 172 F.4th at 227–28 ("Kalshi's

sports-related event contracts" are "'swaps' subject to the CFTC's jurisdiction."); *id.* at 233 (Roth, J., dissenting) ("A plain reading of the Act's text suggests that Kalshi's sports-event contracts fit comfortably within the statutory definition" of swaps.). A transaction may also be a "swap" if it is a binary option on an "excluded commodity" or if the transaction is "commonly known to the trade as a swap." 7 U.S.C. §§ 1a(47)(A)(i) & (iv).

**1.** For starters, event contracts make "payment . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii). Consider a contract in which a participant takes a "yes" position on the Republican candidate to win the presidential election. "[P]ayment" under that contract is plainly "dependent on the occurrence . . . of an event"—namely, that candidate's victory. *See Schuler*, 192 F.4th at 684 ("[W]e do not read 'event' so narrowly as to exclude those events that could be categorized as 'outcomes.' . . . Dictionaries commonly define an 'event' to include an 'outcome.'").

Additionally, to be a swap, the "event" on which the payoff is dependent must be "associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). There "can be no doubt that an array of transactions are 'associated with' the required financial consequences, and constitute swaps under this definition." *Minnesota*, 2026 WL 2150211, at *12 (D. Minn. July 27, 2026). Elections have direct economic consequences for government tax-and-spending policies. Sporting events have implications for "numerous affected stakeholders, including sponsors, advertisers, television networks, franchises, and local and national communities." *Flaherty*, 172 F.4th at 228; *see Coinbase*, 2026 WL 2969682, at *11 (additional examples). The list could go on, but suffice it to say that a wide range of event contracts based on election, sports, politics, or culture events are associated with potential economic consequences, making them swaps.

Some courts have limited the definition of "swap" by declaring that the underlying event must be "*inherently* associated with" a financial, economic, or commercial consequence. *E.g., Assad*, 190 F.4th at 1115 (emphasis added). But that word does not appear anywhere in the statute, and it makes the statute internally inconsistent. For one, it makes the definition of "swap" in prong (ii) complete surplusage. *See Minnesota*, 2026 WL 2150211, at *13 (atextual efforts "to limit the reach of subparagraph (ii) risks making that provision do nothing more than reiterate what subparagraphs (i) and (iii) already accomplish: that reading would, in fact, create surplusage"). Moreover, the CEA's Special Rule makes clear that "swaps" can "involve" events related to "terrorism," "assassination," "war," and "gaming," 7 U.S.C. § 7a-2(c)(5)(C)(i), none of which is inherently financial. And finally, as even the Ninth Circuit had to admit, the CEA does acknowledge "emissions swap[s]" and "weather swap[s]," which "do not refer to a financial instrument or measure." *Assad*, 190 F.4th at 1116. Although the court nonetheless held that "weather and emissions are unlike the winner of a sports game or the number of points scored during a game, or similar sports event contracts," *id.*, it never explained why that purported distinction had any legal significance. The Court should reject the atextual requirement of an "inherent" financial consequence.

To be sure, not every event is associated with a potential economic consequence. As the Northern District of Illinois put it, "[t]he clause reads about as broadly as it could. . . . But broad does not mean unlimited." *Coinbase*, 2026 WL 2969682, at *7. "Any association, actual or potential, must be concrete and articulable," as well as "material." *Id.* at *8. But "[n]o narrower limiting principle has a persuasive hook in the law." *Id.* But Congress tasked *the Commission* with policing the line when contracts styled as swaps are not "associated" with "potential" financial

consequences—a line it has enforced when necessary, *see supra* 7. It did not deputize States to use their gambling laws to attack contracts that, in that State's view, are not swaps.

**2.** None of this is to say that true, casino-style gambling products are swaps—they are not. As the Commission has long recognized, a contract that does not bear the structural hallmarks of a derivative—for example, an instrument that is not "tradeable"—is not a swap. 77 Fed. Reg. 48,208, 48,214 (Aug. 13, 2012) (insurance contracts not swaps because "they are not traded on an organized market or over the counter"). Traditional gambling products do not have these characteristics. These products allow a customer to make a wager with the bookmaker, or "house," as the counterparty. Steven D. Levitt, *Why Are Gambling Markets Organised So Differently from Financial Markets?*, 114 Econ. J. 223, 223 (2004). The bookmaker then can, and does, make money by setting prices (or "lines") that favor the bookmaker. *Id.* at 226. These bets are thus bilateral transactions priced by an in-house bookie, rather than by the market, and so are not readily susceptible to the CEA's exchange-trading requirement for swaps offered to retail participants. *See* 7 U.S.C. § 2(e). Event contracts on a DCM, by contrast, are traded between counterparties on neutral exchanges at market-determined prices and are cleared by centralized clearinghouses, just like the securities market and other futures markets. The DCM then makes money via a transaction fee, irrespective of which way the contract ultimately resolves. That the latter are derivatives in no way implies the same of the former. In fact, the Commission has exercised its rulemaking power to expressly clarify that it has *no* jurisdiction over traditional gambling products. *See supra* 6.

**3.** Event contracts are also swaps because they are "commonly known to the trade as [] swap[s]." 7 U.S.C. § 1a(47)(A)(iv). As the Commission explained in its recent Notice of Proposed Rulemaking, the phrase "commonly known to the trade as a swap" is "a residual, catch-all prong intended to cover instruments that, in the market's view, are swaps." 91 Fed. Reg. at 66,026. It is

certainly clear that at least many of the contracts targeted by Louisiana have long been traded as swaps, including by complying with the Commission's swap regulatory regime. *See* 73 Fed. Reg. at 25,670 (noting that "[s]ince 2005," "[e]vent contracts have been based on a wide variety of interests including the results of presidential elections, the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of legislation, the outcome of corporate product sales, the declaration of war and the length of celebrity marriages"); *In re: Blockratize, Inc. d/b/a Polymarket.com*, CFTC Docket No. 22-09 (Jan. 3, 2022), at 3, 7 (imposing penalties on Polymarket.com for offering "swaps" on topics such as "Will Trump win the 2020 presidential election?" without registering with the CFTC). And DCMs have listed *thousands* of these event contracts as swaps over the past several years. *See* 91 Fed. Reg. at 66,026.

Other market participants have also consistently treated event contracts as swaps. For years, institutional traders have acted as market makers on prediction markets, providing liquidity and earning revenue on the bid-ask spread from peer-to-peer trading volume. A wide array of businesses and individuals have used event contracts to hedge various risks, including those related to sports, weather, and pending legislation.[8] Ultimately, as former CFTC General Counsel Robert Schwartz put it to the House Committee on Agriculture last year, "these sports event contracts are undoubtedly commonly known to the trade as swaps, so the CFTC has [] exclusive jurisdiction."[9]

**4.** If event contracts are not swaps, then the Commission—and the federal government as a whole—would lack *any* jurisdiction over event contracts. That would leave a massive regulatory vacuum. Event contracts, for all their advantages, pose significant risks of manipulation, and the CEA provides a comprehensive framework for mitigating potential abuses. For instance, DCMs

[8] *Id.* (citing, e.g., *Prediction Markets Take a Swing at Hedging for US Small Business*, Reuters (Aug. 28, 2026)).

[9] *CFTC Reauthorization: Stakeholder Perspectives*, *Hearing Before the H. Comm. on Agric.*, 119th Cong. 59 (Dec. 11, 2025) (statement of Robert A. Schwartz).

that offer event contracts must comply with various core principles: they can only list "contracts that are not readily susceptible to manipulation," and they must have capacity to prevent market disruption, publish transaction data, ensure financial integrity in transactions, enforce disciplinary rules, and keep records. 7 U.S.C. § 7(d). None of these protections applies if event contracts are not swaps.

The CEA also equips the Commission with further tools to safeguard market integrity around event contracts subject to its jurisdiction. The Special Rule allows the Commission to prohibit event contracts involving "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.* § 7a-2(c)(5)(C). To that end, the Commission has proposed rulemaking deeming certain event contracts presumptively against the public interest—such as sports contracts based on player injuries, fights, and officiating outcomes, or contracts that pose national-security risks or are based on games of random chance. *See* 91 Fed. Reg. at 35,834–37. Further, the Commission can penalize persons who offer retail event contracts without registering as a DCM. *See In re: Blockratize*, *supra*. All this is contingent on event contracts coming within the Commission's jurisdiction in the first place.

Furthermore, the Commission's jurisdiction to bring enforcement actions for insider trading on prediction markets (including insider trading by Americans on offshore prediction markets, beyond the reach of state gaming laws) has been premised on event contracts qualifying as swaps. *See Van Dyke*, Dkt. No. 1 ¶¶ 61, 72, 81; *Spagnuolo*, Dkt. No. 1 ¶¶ 27, 29, 50. If that premise is rejected, the Commission's jurisdiction would become more tenuous. The Commission's ongoing efforts to bring greater market integrity to event contracts—for instance, via data-reporting requirements, bans on certain contracts that contravene the public interest, data-

sharing agreements with professional sports leagues, etc.—would also be ineffectual if event contracts are not swaps, and no federal regulator would fill its shoes. Instead, there would be 50 different regulators, which makes no sense when considering that event contracts are offered on nationwide exchanges and traded by counterparties around the world.

Accepting Louisiana's interpretation of "swap" would rip significant regulatory authority from the federal government in favor of 50 state-level gambling commissions, leaving in its wake a tremendous vacuum in policing against market manipulation and abuse.

* * *

Many—if not all—of the event contracts offered by CFTC registrants in Louisiana are "swaps." Accordingly, the CFTC has "exclusive jurisdiction" to regulate them. Louisiana has no basis to indiscriminately ban those exchanges from its borders.

## II. The remaining factors favor granting preliminary relief

Absent an injunction, the United States and the CFTC will suffer irreparable harm. Courts widely recognize that the enforcement of an unconstitutional state law is irreparable. *See Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th Cir. 2010) ("If a statute is expressly preempted, a finding with regard to likelihood of success fulfills the remaining [preliminary injunction] requirements."). After all, the United States is injured "when its valid laws in a domain of federal authority are undermined by impermissible state regulations," *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012), and because that injury cannot be undone by an eventual award of damages, it is necessarily irreparable. *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). And because Louisiana 's "enforcement action[]" is not only "imminent" but currently being advanced with all deliberate speed, "there is no adequate remedy at law." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

The public interest and equities prongs likewise support an injunction because "[f]rustration of federal statutes and prerogatives are not in the public interest." *Alabama*, 691 F.3d at 1301. And where a state law is preempted, the State is not "harm[ed] from . . . nonenforcement of invalid legislation." *Id.* Accordingly, as the Third Circuit held, it is neither equitable nor in the public interest to allow States to target event contracts in violation of the Supremacy Clause. *See Flaherty*, 172 F.4th at 232.

Louisiana seeks to usurp the federal government's role as derivatives regulator. Taking issue with at least some contracts traded on DCMs, the state has sought and obtained emergency relief that effectively bars *all* federally regulated contracts in the State. That action effectively nullifies Congress's federal regulation of swaps in the State, irreparably harming the United States and the federal regulator in the process.

## CONCLUSION

Louisiana state law is preempted so far as it purports to ban event contracts traded on CFTC-regulated DCMs and impose up to hundreds of millions of dollars in penalties on exchanges for operating in compliance with federal law. The United States and the CFTC respectfully ask this court to enter a temporary restraining order and preliminary injunction prohibiting the State from applying its laws against CFTC-regulated DCMs in such manner.

Dated: November 13, 2026

Respectfully submitted,

By: /s/ Andrew J. Weisberg
ANDREW J. WEISBERG
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, DC 20581
Tel. 202-418-5574
aweisberg@cftc.gov

*Attorneys for the United States of America*

JONATHAN D. GUYNN
Acting Assistant Attorney General

TIMOTHY J. BORGERSON
Counsel to the Assistant Attorney General
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
Tel. 202-957-3552
Timothy.Borgerson@usdoj.gov

*Attorneys for the Commodity Futures Trading Commission*

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
DAVID W. RUBIN
Senior Assistant General Counsel
ANDREW J. WEISBERG
Senior Assistant General Counsel
HENRY J. DICKMAN
Senior Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, N.W.
Washington, DC 20581
Tel. (202) 209-1087
tbadgley@cftc.gov
jminot@cftc.gov
drubin@cftc.gov
aweisberg@cftc.gov
hdickman@cftc.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2026, I filed a copy of the foregoing memorandum of law using the Court's CM/ECF system. I will also email a copy of this filing to Chief Deputy Attorney General Natalie LaBorde at laborden@ag.louisiana.gov and Assistant Chief Deputy Attorney General Harry J. Philips, Jr. at philipss@ag.louisiana.gov

Dated: November 13, 2026

*/s/ Andrew J. Weisberg*
ANDREW J. WEISBERG
Senior Assistant General Counsel
Commodity Futures Trading Commission